Filed 4/8/25  P. v. Aguillon-Palermo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051096 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 20CR000645) |
| v. | |
| NEIL DENNIS AGUILLON-PALERMO, | |
| Defendant and Appellant. | |

In 2017, defendant Neil Aguillon-Palermo and several Norteño gang members shot at two men who they suspected were rival Sureño gang members.  A jury convicted Aguillon-Palermo of conspiracy to commit murder (Pen. Code, § 182, subd. (a)),[1] two counts of attempted murder (§§ 664, 187), shooting at an occupied motor vehicle (§ 246), and two counts of assault with a firearm (§ 245, subd. (b)).  On appeal, Aguillon-Palermo argues that the trial court abused its discretion by admitting unduly prejudicial evidence of a prior gang shooting, his trial counsel rendered ineffective assistance for failing to object to other gang evidence, and the trial court failed to provide a limiting instruction on the use of evidence of his uncharged crimes.  Finding no reversible error, we affirm.

---

[1] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. *The Operative Information*

In December 2022, the Monterey County District Attorney charged Aguillon-Palermo by a third amended information with conspiracy to commit murder (§ 182, subd. (a)(1); count 1), two counts of attempted murder (§§ 664, 187, subd. (a); counts 2 & 3), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4 & 5), shooting at an occupied motor vehicle (§ 246; count 6), and active participation in a criminal street gang (§ 186.22, subd. (a); count 7). As to all counts, it was alleged that Aguillon-Palermo committed the offenses for the benefit of, at the direction of, or in association with the Norteño criminal street gang (§ 186.22, subd. (b)(1)). As to counts 2 and 3, it was alleged that a principal personally and intentionally discharged a firearm, a handgun, which proximately caused great bodily injury (§ 12022.53, subds. (d) & (e)(1)). As to counts 2 through 6, it was alleged that Aguillon-Palermo personally inflicted great bodily injury (§ 12022.7, subd. (a)). And as to counts 4 and 5, it was alleged that Aguillon-Palermo personally used a firearm (§ 12022.5, subd. (a)).

## B. *The Trial*

The prosecution presented evidence that Aguillon-Palermo and seven members of various Norteño gang subsets shot a father and son on Orchard Avenue while hunting rival Sureños to kill. This was the day after Aguillon-Palermo and three of the same gang members had participated in an uncharged shooting in Hebbron Heights.

### 1. *The Attempted Murders at Orchard Avenue (The Charged Crimes)*

In February 2017, D.H. and his father, J.H. were driving to their Orchard Avenue home when J.H. noticed a white car following them. When D.H. parked in the driveway of the family's home, the two men were fired on. Trying to save himself and his father,

D.H. drove their car backwards into their assailants' car, a white Lexus.[2] J.H. had been shot a total of three times, twice in his left arm and once just below his neck. D.H. had multiple gunshot wounds to the left shoulder and left flank.

Evidence recovered from the crime scene included spent case cartridges for .40-caliber, .380-caliber, and .22-caliber ammunition, from at least six manufacturers. A criminalist opined that at least three guns had been fired, given the different calibers, and that there were likely two .40-caliber weapons.

Surveillance video taken from D.H. and J.H.'s driveway showed four suspects on foot, three of whom appeared to shoot toward the victims' car. One of the suspects had long hair that was consistent with Aguillon-Palermo's style at the time.

Aguillon-Palermo was found to be a likely contributor of DNA found on the driver's side front door and rear door panels of the assailant's car (abandoned at the scene) and on a cell phone found in the backseat.

### 2. Gang Member Testimony and Evidence of the Hebbron Heights Shooting

#### a. BG6

In 2017, BG6[3] was a member of the Boronda Norteño gang in Salinas. He had been in the gang since participating in a shooting with his "big homie," "Shocky" Tavale. Boronda was a " 'hood" or subset of the Norteño criminal street gang in Salinas. There are other 'hoods in Salinas, and the Norteño subsets generally worked and committed crimes together.

A "big homie" like Tavale is a gang member who gives orders to other members. BG6 had seen Tavale shoot at people and arrange killings. Tavale did not believe in "hitting people up" (asking where they are from); instead, the gang assumed rival gang

---

[2] The white Lexus had been reported stolen on January 27, 2017.

[3] BG6 was by then in federal custody for several murders, attempted murders, and drug offenses. BG6 had signed a plea agreement with the prosecution, which included his testifying for the federal government.

membership based on territory and killed suspected rivals "right then and there." The gang's ideology was to proceed with a killing if the target is an "easy kill," and if the target ended up being someone from their own gang, they would "worry about that, after the fact." Tavale's objective was for Boronda to have the most murders. Under Tavale's direction, it was Boronda's "thing . . . to empty the clip at the scene" to ensure a target was killed. Shooters were to disable the target by firing five times to the chest or abdomen, then empty "the rest of the clip in their head, once they fall down."

The Boronda subset often went "hunting" (finding someone to kill) Sureños near the Salinas airport because of its easy exit route and Tavale's belief that all Sureños lived in that neighborhood. BG6 had committed murders and had been " 'stamped' " or "certified" in the gang, receiving a gang tattoo. Only two 'hoods, Santa Rita and Boronda, required murder for gang certification.

BG6 knew Santa Rita members Andrew Alvarado and Luis Atayde, as well as fellow Boronda member BG4. BG6 knew Aguillon-Palermo associated with the Acosta Plaza subset but did not know what if any status Aguillon-Palermo had within Acosta Plaza.

In February 2017, BG6 received a message from Tavale that he wanted to "do something," which BG6 understood as wanting to go "hunt." So BG6 met Tavale at an apartment, along with Alvarado and BG4. Discussing where to go and who to kill, the group learned that Aguillon-Palermo had stolen a car and wanted to join them. Aguillon-Palermo and Atayde arrived, and the six planned the hunt together.

Atayde, a friend of BG6, was "trying to come up from Santa Rita," so Atayde and BG6 would be shooters with Aguillon-Palermo driving. Tavale gave BG6 a .40-caliber firearm and Atayde a .22-caliber firearm. Tavale and BG4 would be in a security car to the rear of Aguillon-Palermo's, and Alvarado would lead the convoy in another security car. The lead security car would look for potential threats or law enforcement, while the

4

rear security car could swerve to cut off potential police pursuit of the shooter car. The convoy communicated by a three-way call as they drove.

At Hebbron Heights, Alvarado reported spotting "possible Southsiders," so Tavale told the shooters to go "get 'em." Aguillon-Palermo pulled up alongside two men standing in the street, and BG6 shot one man. The man fell to the ground and BG6 continued to fire into the man's body, emptying his clip as Tavale had instructed. Atayde also fired.

Celebrating afterward at Tavale's apartment, Tavale was "happy and proud" that, at an estimated four minutes, BG6's shooting was the fastest murder Tavale had been party to. The shooting also certified Atayde.

The next day, Tavale summoned BG6 to his apartment, telling him that Tavale's cousins, Angel and TK, were there and were "excited" for the chance to use the stolen white Lexus in a shooting. This time, Aguillon-Palermo wanted to be a shooter but wanted no one else to drive the car he had stolen. BG6 thought that Aguillon-Palermo had his own gun, and Atayde used the same .22-caliber weapon as the night before. Tavale and BG6 took the lead car, Alvarado drove the rear security car, and Aguillon-Palermo drove the middle car with Angel, TK, and Atayde as passengers.

At Orchard Avenue, Tavale saw someone he thought might be a Sureño. As Tavale and BG6 drove away from the block, they heard shots fired; on the three-way call, Alvarado described the victim driving his car into Aguillon-Palermo's. Seeing Aguillon-Palermo and the others running down the street, Tavale and BG6 picked them up.

b. **BG4**

BG4 was a Boronda member and had been certified after committing a murder.[4] Tavale was BG4's "big homie" and had brought him into the gang. On February 11,

---

[4] BG4 was presently in federal custody for a series of murders and attempted murders. BG4 had also entered into a plea agreement with the Monterey County District Attorney's Office.

2017, BG4, BG6, and Atayde were hanging out and selling drugs when Aguillon-Palermo pulled up in a white SUV, saying he had stolen it after getting pulled over by the police. Tavale thought the stolen car presented a good opportunity to kill somebody. The day of the Hebbron Heights shooting, Aguillon-Palermo drove the middle shooter car. And it was near Hebbron Heights that BG4 and Tavale heard gunshots.

Of the next night's shooting, Aguillon-Palermo told BG4 that after that shooting, he tried to run "towards his 'hood," but Tavale picked him up on the street instead.

### c. BG1

One night, Aguillon-Palermo picked BG1 up in a white Lexus. Aguillon-Palermo told BG1 that he had "issues with the cops and stumbled upon [the car] and took it from some lady." A few days later, Aguillon-Palermo sent BG1 a text message inviting her to go over to a house. This time, Aguillon-Palermo arrived in a different vehicle. When asked, Aguillon-Palermo said that something had happened to the white Lexus. Aguillon-Palermo explained that he and several others had "stumbled upon somebody" and that they had been "in a shootout and total[]ed the car while — while handling the business that they were doing." Aguillon-Palermo elaborated that they had followed a car and shot at the car's occupants. The other car rammed into the Lexus trying to stop it, totaling the Lexus.

### 3. Evidence Tying the Hebbron Heights and the Orchard Avenue Shootings

Spent cartridges found at both scenes indicated that it was highly likely that one of two .40-caliber weapons and the same .22-caliber weapon had been used at both shootings. The stolen white Lexus had damage to the passenger-side portion of its grille, which appeared to match a chrome piece that was found at the scene of the Hebbron Heights shooting.

### 4. Aguillon-Palermo's Social Media Messages and Post-arrest Jail Call

Aguillon-Palermo's Twitter account had a message below his account name that read "Certified $tallion. So you know I'm a goer baby," which an officer testified meant

that the user had committed a gang-related homicide or shooting. About 30 minutes after the Orchard Avenue shooting, Aguillon-Palermo sent another user a direct message on Twitter saying, "No more phone" and "No more whip," meaning a car. Aguillon-Palermo received messages back telling him that the police were looking for him and that he should cut his hair.

In December 2019, after his arrest, Aguillon-Palermo made a call from jail. Aguillon-Palermo said that he was in jail for "two attempts" and that he was "facing a little, a little scenario." Told that he had "just thr[own his] life away," Aguillon-Palermo responded, "I know. I know, I know. I'm stupid, fool." He then acknowledged, "Decisions come with repercussions."

## C. *The Verdict*

The jury found Aguillon-Palermo guilty of conspiracy to commit murder (§ 182, subd. (a)(1); count 1), two counts of attempted murder (§§ 664, 187, subd. (a); counts 2 & 3), two counts of the lesser included offenses of assault with a firearm (§ 245, subd. (a)(2); counts 4 & 5),[5] and shooting at an occupied motor vehicle (§ 246; count 6). As to counts 1 and 2, the jury found true the allegation that the attempted murders were committed with willful deliberation and premeditation in violation of section 189. As to counts 2 and 3, the jury found not true the allegation that Aguillon-Palermo personally discharged a firearm during the offense (§ 12022.53, subd. (d)). As to counts 2 through 6, the jury found not true the allegation that Aguillon-Palermo inflicted great bodily injury (§ 12022.7). And finally, as to counts 4 and 5, the jury found true the allegation Aguillon-Palermo had personally used a firearm (§ 12022.5, subd. (a)).

---

[5] The jury found Aguillon-Palermo not guilty of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4 & 5).

**D.**     *The Bifurcated Trial on the Gang Offense and Enhancements*

Several officers testified about predicate offenses to establish the Norteño gang was a criminal street gang. Certified records of conviction of other gang members were admitted into evidence.[6]

The prosecution's gang expert testified that the Norteños were an ongoing, organized group of three or more individuals operating in Monterey County, where their rivals were the Sureños and their primary activities included murder, attempted murder, assault, manslaughter, and selling illegal drugs. The expert opined that Tavale, Atayde, BG6, BG4, and Aguillon-Palermo were all Norteño gang members on February 12, 2017. According to the expert, gang subsets are different factions identified by neighborhoods but are "basically the same gang," and it is common for different Norteño subsets like Boronda, Santa Rita, and Acosta Plaza, to work together to commit crimes. Given a hypothetical that tracked the facts of the Orchard Avenue shooting, the expert opined that the crimes would have been committed for the gang's benefit.

**E.**     *The Verdict on the Bifurcated Trial*

Following the bifurcated trial, the jury found true the gang enhancements (§ 186.22, subd. (b)(1) & (5)) alleged as to counts 1 through 6. As to counts 2, 3, and 6, the jury further found true the allegation that a principal in the offense personally discharged a firearm (§ 12022.53, subd. (e)(1)). And finally, the jury found Aguillon-Palermo guilty of participation in a criminal street gang (§ 186.22, subd. (a)).

---

[6] First, Duane Joseph Jefferson and Robert Campos were Norteño gang members on September 25, 2016. Both men were convicted of Health and Safety Code section 11351 with gang enhancements while working together. Second, Fernando Miranda and Johnny Marcos Magdaleno were Norteño gang members on April 14, 2014, and that Miranda was convicted of assault with a deadly weapon and voluntary manslaughter and Magdaleno was convicted of attempted murder over the same incident. And finally, Elijah Matthew Hernandez and Jesse Anthony Flores were members of the Norteño criminal street gang on October 11, 2013, when they were convicted of voluntary manslaughter with gang enhancements while working together.

## II. DISCUSSION

### A. *The Admission of the Gang Evidence*

Although the substantive gang offense and gang enhancements were adjudicated in a bifurcated trial, a significant amount of gang evidence was introduced during the trial on the non-gang offenses. This evidence included testimony from gang members like BG6 and BG4, who described the violent ideology of the Boronda Norteño subset, as well as evidence tying Aguillon-Palermo to the uncharged shooting at Hebbron Heights. Aguillon-Palermo argues that the gang evidence was erroneously admitted and that any forfeiture of his evidentiary claims denied him the effective assistance of counsel. We find no error in the admission of evidence and no ineffective assistance of counsel.

#### 1. *Additional Background*

Defense counsel moved in limine to exclude under Evidence Code sections 1101 and 352 evidence of Aguillon-Palermo's reputation or character, specifying at a later hearing that Aguillon-Palermo sought exclusion of "any gang evidence . . . , specifically . . . narrowing right now [to] the Hebbron Heights case." The prosecution argued for the admission of gang evidence for the "purposes of intent, motive . . . and willful deliberation and premeditation, aiding and abetting, and conspiracy."

The trial court ruled that the Hebbron Heights shooting was admissible under Evidence Code section 1101, subdivision (b) and was not made inadmissible by Evidence Code section 352. But the court invited the defense to later identify "specific aspects . . . pertaining to Hebbron Heights or specific pieces of gang related evidence that you would like to object to before it is introduced" for the court to rule on separately.

At trial, when BG6 was asked questions about the Hebbron Heights shooting, defense counsel generally cited "earlier briefs" as the basis for objection. But defense counsel made no specific objections when BG4 testified about his criminal history or when BG6 testified about other facets of the Norteño gang—including the gang's practice

9

of shooting first without verifying Sureño affiliation, or Tavale's directive to ensure a target's death by firing until they emptied their clips.

## 2. *Legal Principles*

"California courts have long recognized the potentially prejudicial effect of gang membership." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) In 2021, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.), which in part added section 1109 and requires that a gang enhancement charge be tried separately from the underlying offense upon the defense's request. (*People v. Burgos* (2024) 16 Cal.5th 1, 7.) In so doing, the Legislature made specific findings, declaring that " '[g]ang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people.' " (*Id.* at p. 10, quoting Stats. 2021, ch. 699, § 2, subd. (d)(6), p. 8862.)

But despite the potentially prejudicial impact of gang evidence, gang evidence can be otherwise relevant to the charged offenses, and the People are generally entitled to introduce evidence of gang affiliation and gang activity in certain cases. (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) "Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' " (*Ibid.*)

Evidence of a defendant's uncharged crimes is also admissible if relevant. Under Evidence Code section 1101, subdivision (a), except as provided in certain specified circumstances, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." But subdivision (b) of Evidence Code section 1101 specifies that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil

10

wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." The degree of similarity of criminal acts is a key factor in the admission of other crimes evidence—" ' " 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought . . . .' " ' " (*People v. Scully* (2021) 11 Cal.5th 542, 586.)

" 'The least degree of similarity . . . is required . . . to prove intent.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 25.) To be admissible, " 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Ibid.*) Greater similarity is required to prove a common plan: " '[E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' " (*Ibid.*) And finally, " '[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.' [Citation.] To establish identity, the uncharged and charged crimes ' "must be so unusual and distinctive as to be like a signature." ' " (*Id.* at p. 26.)

But even if other crimes evidence is otherwise admissible under Evidence Code section 1101, subdivision (b), and even if evidence of gang affiliation or gang activity is relevant, evidence may be subject to exclusion under Evidence Code section 352 if its probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *Chhoun*, *supra*, 11 Cal.5th at pp. 26, 33.) The California Supreme Court has recognized that "evidence of other crimes is 'inherently prejudicial.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1331 (*Foster*).) And due to the

11

inherent risk in admitting uncharged offenses, evidence of uncharged offenses " 'are admissible only if they have *substantial* probative value.' " (*Ibid.*)

We review the trial court's admission of evidence under Evidence Code sections 1101 and 352 for an abuse of discretion. (*Chhoun*, *supra*, 11 Cal.5th at p. 26.) Error is shown only if " ' " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*)

### 3. *The Hebbron Heights Shooting*

Because the Hebbron Heights shooting shared numerous commonalities with the Orchard Avenue shooting, rendering it of substantial probative value (see *Foster*, *supra*, 50 Cal.4th at p. 1331), and because its admission did not create a "substantial danger of undue prejudice" (Evid. Code, § 352), we find no abuse of discretion in the trial court's evidentiary ruling permitting its admission.

The shootings at Hebbron Heights and Orchard Avenue took place less than a day apart. In both cases, the gang members planned to use the same stolen car obtained by Aguillon-Palermo to find someone to kill. In both cases, the gang members set out using the same tactics—the same three-car formation and communication by a three-way call. Both cases involved four of the same participants—BG6, Tavale, Atayde, and Aguillon-Palermo. And in both cases, the gang members chose their potential targets based on one member's unconfirmed suspicion that the targets were Sureños, then fired without warning multiple times, even after the target was disabled.

There were strong similarities between the two crimes, and the Hebbron Heights shooting was thus relevant to prove a material fact, the intent to kill necessary to convict Aguillon-Palermo of the attempted murders and conspiracy. (*People v. Mumin* (2023) 15 Cal.5th 176, 190 (*Mumin*) ["*attempted* murder requires a specific intent to kill"]; *People v. Cortez* (1998) 18 Cal.4th 1223, 1228 (*Cortez*) ["conspiracy to commit murder requires a finding of unlawful intent to kill"]; see also *People v. Tran* (2011) 51 Cal.4th

12

1040, 1048 (*Tran*).)  " ' " 'We have long recognized "that if a person acts similarly in similar situations, he probably harbors the same intent in each instance." ' " ' " (*Chhoun*, *supra*, 11 Cal.5th at p. 27.)  The planning and execution of the Hebbron Heights shooting tended to suggest that Aguillon-Palermo's participation in the next day's Orchard Avenue shooting was with the intent to kill.  The close proximity in time also enhanced the probative value of the Hebbron Heights evidence.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1150 [uncharged acts that occurred within four days of each other enhanced probative value of other crimes evidence].)  The Hebbron Heights shooting was thus " 'sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Chhoun*, at p. 25.)

The evidence was also relevant to whether Aguillon-Palermo acted with a common design or plan.  To prove Aguillon-Palermo conspired to commit murder, the prosecution had to prove that "two or more persons conspire[d]" (§ 182, subd. (a)) together "[t]o commit any crime" (*id.*, subd. (a)(1)).  Evidence that Aguillon-Palermo and several of the same gang members together decided in advance the different roles each would play in the shootings, and evidence of similar tactics common to both shootings, was relevant to prove whether Aguillon-Palermo " 'engaged in the conduct alleged to constitute the charged offense.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 28.)  In other words, evidence that several of the same participants had conspired to commit a very similar crime the day before the charged offenses was substantially probative of whether Aguillon-Palermo conspired to commit the next murders, rather than spontaneously shooting to kill.[7]

---

[7] Citing the prosecutor's closing argument, Aguillon-Palermo characterizes this as an argument that Aguillon-Palermo had a predisposition to commit gang crimes and that the prior shooting was prohibited propensity evidence.  But during closing argument, the prosecutor argued that the Hebbron Heights shooting was relevant to show Aguillon-Palermo's intent to kill, his motive to become certified in the gang based on his social media accounts, and the gang members' common scheme.  Arguing that the Hebbron Heights shooting was evidence of Aguillon-Palermo's intent, motive, or that there was a

Furthermore, the evidence was not substantially more prejudicial than it was probative. " ' "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.] ' " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.' " ' [Citation.] The 'prejudice' which [Evidence Code] section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 275.) Certainly, there was evidence that suggested that the Hebbron Heights shooting resulted in a death, given BG6's testimony that he fired multiple rounds even after the victim had fallen to the ground, indicating that the wounds inflicted were lethal or were of great bodily harm, and BG6's further testimony that the group celebrated the killing.[8] But this evidence, though undoubtedly prejudicial, was not significantly more inflammatory than the facts of the current case, where there was evidence that multiple shooters fired multiple times at two victims at the driveway of their home, chosen solely on Tavale's suspicion that they were Sureños, with both victims suffering from multiple gunshot wounds. And as acknowledged by the trial court, there was no evidence suggesting that Aguillon-Palermo fired any gunshots at Hebbron Heights; indeed, the only evidence presented pointed to him acting solely as a driver in that incident.

common plan or design was not an argument on propensity: the argument was not that Aguillon-Palermo was a gang member and that gang members have a predisposition to kill. Rather, the argument was that Aguillon-Palermo's participation in the Hebbron Heights case, where there was evidence that the coparticipants had discussed the crime and had undertaken the shooting with the intent to kill, demonstrated that his participation in the Orchard Avenue shootings was likewise done with the intent to kill.

[8] Both parties characterize the Hebbron Heights case as a "murder," but none of the parties cite to where in the record there was conclusive evidence presented to the jury that the victim in that case was killed. In our own review of the record, the only reference to the victim being killed is BG6's testimony about how Tavale was happy that it was the "fastest murder" that he had participated in and that Atayde had been certified in the gang after the shooting.

14

We recognize that the potentially prejudicial impact of this uncharged act could be heightened because there was no evidence that Aguillon-Palermo was convicted of any crimes stemming from the shooting. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) But simply because there are some factors supporting the exclusion of evidence under Evidence Code section 352 does not render evidence patently inadmissible. (See *ibid.*) In *Ewoldt*, for example, the California Supreme Court considered the totality of the circumstances, including that the defendant's actions there did not result in criminal convictions, in concluding that the trial court did not abuse its discretion in admitting uncharged acts. (*Ibid.*) "When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion." (*Tran*, *supra*, 51 Cal.4th at p. 1049.) And an abuse of discretion is found only if the " ' "trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Foster*, *supra*, 50 Cal.4th at pp. 1328–1329.)

Arguing that the evidence should not have been admitted, Aguillon-Palermo contends in part that there was already direct evidence of motive, intent, and common plan, as there was evidence of communications between himself and the other participants in the Orchard Avenue shootings that tended to prove the prosecution's case without a resort to uncharged crimes. But "[e]ven when other evidence is present, it remains the prosecution's burden" to prove every element of the charged offenses beyond a reasonable doubt. (*Chhoun*, *supra*, 11 Cal.5th at p. 29.) Thus the prosecution possessed the " 'right to introduce all relevant and admissible evidence toward that end.' " (*Ibid.*)

Aguillon-Palermo also insists that there was no signature modus operandi or distinctive common plan between both shootings, arguing that "driving up to someone and shooting them is quotidian in the world of gang murder." But even assuming that a drive-by shooting is common in gang violence, this argument ignores the distinctive

aspects of the drive-by shootings here—the sheer number of shots fired; unsuspecting victims who gave no overt indication of gang membership; use of a stolen car in a three-car convoy; and coordination by a three-way call. Furthermore, Evidence Code section 1101, subdivision (b) does not require that other crimes evidence share a unique or distinctive feature with the charged crimes. The pertinent issue is whether the other crime has sufficient overall similarity to lead to a logical inference over some relevant, disputed element such as intent. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 16–17 [other crimes evidence that shed light on a defendant's intent may lead to logical inference of intent at the time of charged offense if two crimes are substantially similar].) For example, to establish existence of a common design or plan, it is sufficient that " 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 828.)

Finally, Aguillon-Palermo argues that the Orchard Avenue shooting was not conducted according to the gang's "shooting protocol." But just because the two shootings were not completely identical—in the Orchard Avenue shooting, the gang members stepped out of the car to fire upon the victims but at Hebbron Heights, they stayed inside the car—these differences "do not undermine the probative value of the crimes' many similarities." (*Chhoun*, *supra*, 11 Cal.5th at p. 27.) In any event, BG6 testified that the two shootings were generally carried out in similar fashion, describing the three-car formation the gang members took. "In an Evidence Code section 1101, subdivision (b) analysis, ' "features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." ' " (*Chhoun*, at p. 27.) And that Aguillon-Palermo was a driver only at Hebbron Heights and both a shooter and a driver at the Orchard Avenue shooting is explained by other evidence in the record suggesting that this would be a natural progression for one seeking to establish gang certification.

Accordingly, we find no abuse of discretion in the trial court's admission of evidence about the Hebbron Heights shooting.

### 4. *The Other Gang Evidence*

In addition to the evidence of the Hebbron Heights shooting, Aguillon-Palermo argues that the trial court erred by admitting other prejudicial gang evidence during the trial on the underlying charges. To the extent his claims have been forfeited, Aguillon-Palermo argues in a supplemental brief that he received ineffective assistance of counsel.

### a. *Forfeiture*

Based on the limited nature of the objections made at trial, these additional evidentiary claims have been forfeited. Although defense counsel's in limine motion broadly sought exclusion of all gang-related evidence, the trial court at the pretrial hearing did not address all aspects of the gang evidence the prosecution sought to admit. The trial court *only* granted the prosecution's general request to present evidence of the Hebbron Heights case, and in doing so expressly qualified that specific objections to aspects of the Hebbron Heights shooting should be raised at trial. The trial court stated that if the defense had "specific aspects or specific pieces of evidence pertaining to Hebbron Heights or specific pieces of gang related evidence that [the defense] would like to object to before it is introduced, then we can take up those motions separately." It is therefore apparent that the trial court did not categorically rule that all gang evidence was admissible. In fact, the court expressed that additional challenges could be made to specific pieces of gang evidence, including specific aspects of the Hebbron Heights shooting. In short, the trial court reserved the admissibility of the gang evidence pending further objection by the defense. As no further objections were made either pretrial or at

17

trial when the evidence was proffered, any claim of error has been forfeited. (Evid. Code, § 353.)[9]

### b. *Ineffective Assistance of Counsel*

In a supplemental brief, Aguillon-Palermo argues that to the extent his evidentiary claims have been forfeited, his counsel was ineffective. To prevail on a claim of ineffective assistance of counsel, Aguillon-Palermo must establish both that his counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To show deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) And to establish prejudice, a "defendant must show that there is a reasonable probability"— "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

Aside from the Hebbron Heights shooting, Aguillon-Palermo identifies the following evidence as unduly prejudicial: evidence of the Boronda gang's certification process and murderous promotion practices, as he was not a member of the Boronda subset, and the "lethal histor[y]" of his accomplices. In particular, BG6 testified about the Boronda subset's violent practices—shooting without confirmation of the targets' gang allegiance; compliance with Tavale's directive to fire until empty into the target's

---

[9] Even assuming we could construe the trial court's ruling on the prosecutor's in limine motion as an implicit admission of all gang evidence, the general rule is that when an in limine ruling has been made that evidence is admissible, a party seeking exclusion must object again at trial when the evidence is proffered to preserve the issue on appeal. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1108.) An exception is when there is a " 'sufficiently definite and express ruling on a motion in limine,' " that has identified a specific body of evidence. (*Id.* at pp. 1108–1109.) But this exception is inapplicable here. The defense motion in limine stated only generally that all gang evidence was to be excluded, and the trial court did not make either a sufficiently definite or express ruling on any of the gang evidence aside from the Hebbron Heights case.

torso and head; and Tavale's objective of increasing Boronda's murder count. BG4 offered fewer details about the nature of the Boronda subset, though he testified that he was a Boronda member and had been "certified in January of 2017" after he "did a murder."

First, we disagree with the premise that the Boronda gang's certification process or murderous promotion practices were irrelevant unless Aguillon-Palermo was himself a part of the Boronda subset. The evidence was relevant because it was probative of Aguillon-Palermo's motive. There was testimony that distinct Norteño subsets committed crimes together and that Aguillon-Palermo associated with the Acosta Plaza Norteño subset. The prosecution also presented evidence that Aguillon-Palermo wanted to be certified—identifying himself on social media as " 'Certified $tallion' " and boasting of " 'Shooter gang putting numbers on the scoreboard.' " Though BG6 testified that only two subsets, Santa Rita and Boronda, required murder for certification, the fact that Aguillon-Palermo valued gang certification tended to suggest that the prospect of elevating his gang status supplied a motive to conspire with a subset like Boronda that was intent on maximizing its body count.

Furthermore, the evidence was relevant to prove Aguillon-Palermo's intent. To prove the elements of attempted murder and conspiracy to commit murder, the prosecution was required to prove that Aguillon-Palermo intended to kill. (*Mumin*, *supra*, 15 Cal.5th at p. 190; *Cortez*, *supra*, 18 Cal.4th at p. 1228.) BG4 testified that he participated with Aguillon-Palermo and others during the Hebbron Heights shooting, and BG6 testified that he was a participant in the Orchard Avenue shooting. The participants' planning of the shootings—reflecting their shared intent in doing so—was relevant as circumstantial evidence of Aguillon-Palermo's intent, as BG6 testified that the entire group planned the shootings together. (See *People v. Abilez* (2007) 41 Cal.4th 472, 506–507 [intent for robbery conviction seldom established by direct evidence and is usually inferred from circumstantial evidence].)

19

Second, Aguillon-Palermo does not meet his burden on appeal to demonstrate that there could be no rational tactical purpose or satisfactory explanation for counsel's failure to object. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) And as Aguillon-Palermo himself acknowledges, counsel may have calculated that by introducing evidence of BG6 and BG4's own acts of murder and the violence employed by the Boronda subset, the jury would have found their testimony less credible and motivated by their own desire to have a more lenient sentence in their cases, thereby bolstering Aguillon-Palermo's own defense. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295 [crimes of moral turpitude may be relevant to prove or disprove witness's honesty or veracity]; Evid. Code, §§ 785, 788.)

Counsel may have also declined to object in recognition that BG6's testimony about Boronda general practices was relevant to show that the Orchard Avenue shooting was neither anomalous nor coincidentally similar. The men conspired together to hunt rival gang members, and upon finding potential victims did not seek to ascertain whether the victims were in fact gang members before opening fire, and the men fired multiple rounds with the intent to kill. Thus, counsel may have reasonably concluded that the evidence was relevant and that any objection would have been futile. Counsel does not render ineffective assistance by failing to make a meritless objection. (*People v. Lucero* (2000) 23 Cal.4th 692, 732 [" '[c]ounsel may not be deemed incompetent for failure to make meritless objections' "].)

Aguillon-Palermo thus does not demonstrate that his counsel's performance was deficient for failing to object to the gang evidence at trial. (*Strickland*, *supra*, 466 U.S. at p. 688.)

**B.**     *Instructional Error*

Aguillon-Palermo initially argued that the trial court erred by failing to sua sponte instruct the jury with CALCRIM No. 375 on the appropriate standard of proof to apply to other crimes evidence—that is, to consider the evidence only if the People proved that Aguillon-Palermo committed the act by a preponderance of the evidence. It is true that the clerk's transcript omits CALCRIM No. 375, but the reporter's transcript reflects that the trial court at least orally administered the instruction, as Aguillon-Palermo has conceded upon our inquiry. Accordingly, he now agrees it is unclear "whether the absence of CALCRIM No. 375 in the Clerk's Transcript means the packet given the jury was incomplete or whether the instruction was not scanned in the preparation of the Clerk's Transcript." And although he notes his statutory right to have written instructions provided to the jury (§ 1093, subd. (f); see also *People v. Trinh* (2014) 59 Cal.4th 216, 234 (*Trinh*)), he stops short of arguing that this statutory right was in fact violated (Aguillon-Palermo "submit[ted] on the question of whether the instruction was in fact included in the jury's packet of instructions" in his supplemental brief and withdraws as "moot[]" his alternative claim that trial counsel was ineffective for failing to request the instruction.) Indeed, Aguillon-Palermo now represents that "[a]ccording to [trial] counsel's instruction packet, the jury was given CALCRIM No. 375."

Trial counsel's set of the written instructions is not part of our record, but our regular presumption that a judgment or order of the trial court is correct requires an appellant to affirmatively show error. (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) And based on the record before us, Aguillon-Palermo has not affirmatively shown a violation of his statutory right to have a complete set of written instructions delivered to the jury.[10]

---

[10] To the extent Aguillon-Palermo still argues that omission of the written instruction could have prejudiced him, he demonstrates no reasonable probability of a more favorable result absent the assumed error. (See *Trinh*, *supra*, 59 Cal.4th at p. 234;

21

## III.   DISPOSITION

The judgment is affirmed.

---

*id*. at p. 235 [applying *People v. Watson* (1956) 46 Cal.2d 818, 836 to § 1093 error].) As in *Trinh*, we presume the jury followed the oral instructions as given, and the record suggests no jury confusion or failure to understand or apply the given instructions.  (*Id.* at p. 235.)

_____

LIE, J.

WE CONCUR:

_____

DANNER, Acting P. J.

_____

BROMBERG, J.

*People v. Aguillon-Palermo*
H051096